IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| OXFORD HOUSE, INC., *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:21-cv-655-RAH |
| | ) | [WO] |
| CITY OF DOTHAN, ALABAMA, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

### INTRODUCTION

"Oxford House" is a sober living concept in addiction recovery premised on a democratically run, self-supporting, and drug-free home[1] consisting of six to fifteen unrelated residents. In other words, an Oxford House is an unincorporated association of unrelated individuals who share a common bond of addiction recovery. Typically, an Oxford House residence will enter into a charter with Oxford House, Inc. (OHI), which will allow the house to operate under OHI's 501(c)(3) umbrella and to receive support, education, assistance, and monitoring from OHI.

---

[1] The Plaintiffs throughout take inconsistent positions as to whether an Oxford House is a group home. On the one hand, they claim in their briefing that it is not (*see* Doc. 58 at 8 ("Oxford Houses are not businesses, group homes, substance abuse centers, halfway houses, or shelters.")), but in the testimony of their representatives such as Lori Holtzclaw, they acknowledge that they are group homes (*see* Doc. 58-3 at 86 ("Q. Okay. The Oxford Houses are group homes, are they not? A. Correct.")). The City considers them to be operating as a group home for recovering addicts. (Doc. 58-4 at 18, 20–21.)

1

The concept requires, among others, that residents of an Oxford House elect officers, including a president, vice-president, treasurer, comptroller, and secretary; that associational names be used for contracts such as leases, bank accounts, and utilities; that each house obtains a federal employer identification number; and that each house pay chapter dues and conduct regular weekly meetings and occasional special meetings where treasurer's reports are presented.

While the litigation history surrounding the Oxford House concept often has involved zoning issues, this lawsuit presents a novel issue concerning a utilities account application. When two new Dothan-based Oxford Houses first approached the City of Dothan about opening utilities accounts under their Oxford House associational names using federal employer identification numbers (EIN), the City required that they first present a business license, which the City was willing to provide free of charge as it did with all non-profit associations. However, the Oxford Houses did not believe they should be required to obtain business licenses, even free ones, claiming they are not businesses but rather family units. Therefore they refused the City's request. With no business licenses in hand, the Oxford Houses were unable to open utilities accounts in their associational (that is, Oxford House) names.

OHI and the Dothan-based Oxford Houses (collectively, the Plaintiffs or Oxford Houses) then sued the City, claiming the City had discriminated against them

based on disability in violation of the Fair Housing Act.  The Plaintiffs then filed an Amended Complaint (Doc. 29), which is the operative complaint.  Both sides have moved for summary judgment, and the issues have been fully briefed.  For the reasons explained below, the Plaintiffs' motion for partial summary judgment is due to be DENIED, and the City's motion for summary judgment is due to be GRANTED.

## JURISDICTION AND VENUE

The parties do not contest personal jurisdiction or venue, and there are adequate allegations to support both.  *See* 28 U.S.C. § 1391.  The City, however, alleges that the Plaintiffs lack Article III standing, so subject matter jurisdiction is contested.

## FACTUAL BACKGROUND

Around July 28, 2021, Vanessa Phelps and Wesley Ford, both of whom were employed by OHI and were not to become residents of any Dothan-based Oxford House, applied with the City to initiate utility service at a Dothan residential address. Of key importance to the current dispute, they requested the City to place the account in the name of Oxford House-Dothan, and not in the name of any individual person. (*See* Doc. 16-3 at 12.)  Because Phelps and Ford applied for service in Oxford House-Dothan's associational name, provided an EIN and not a personal social security number, and gave organizational email addresses for contact information, the City

informed them that they would first need to provide a business license, which the City would provide free of charge to them as it did with other non-profit organizations, and in particular, other group homes. According to the City, a business license was required per the City's regulations and because the information in the licenses concerning responsible persons assisted the City in later collecting on delinquent accounts.[2]

Instead of accepting the City's offer of a free business license, OHI requested an accommodation in that Oxford House-Dothan and all future Oxford Houses be exempted from complying with the City's business license requirement. The City declined the request, stating among other reasons that the license requirement applied equally to all organizations, including organizations with purposes akin to those of an Oxford House.

Undeterred, Phelps applied for another utilities account in the name of a newly established Oxford House, this time named Oxford House-Coop. Like with Oxford House-Dothan, Phelps refused the City's offer of a free business license. Therefore, Phelps was unable to open a utilities account in the name of Oxford House-Coop.

Phelps and Ford then approached the landlord/owner of the two houses and obtained the landlord's agreement to apply for utilities in her own name. The

---

[2] Even if a business license was obtained, the property still would be designated as residential use and subject to residential, not commercial, utility rates.

landlord did so, and the City accepted her account applications and opened the accounts. Since then, the City has provided uninterrupted utility service at both Oxford House locations, and both houses have remained fully occupied and operational in the Oxford House concept.

But that was not the end. In early December 2021, Phelps applied for a utilities account for a third Oxford House location in Dothan, named Oxford House-Dodge. The same result occurred. Rebuffed again, Phelps accepted the landlord's offer to apply for the utilities in his individual name. But this time, the application was withdrawn after a directive from OHI's legal counsel.

## STANDARD OF REVIEW

"Summary judgment is proper if the evidence shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1311 (11th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)). "[A] court generally must 'view all evidence and make all reasonable inferences in favor of the party opposing summary judgment.'" *Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1252 (11th Cir. 2016) (citation omitted). However, "conclusory allegations without specific supporting facts have no probative value." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924–25 (11th Cir. 2018) (citation omitted). If the record, taken as a whole, "could not lead a rational trier of fact to find for the non-moving party," then there is no genuine

dispute as to any material fact. *Hornsby-Culpepper*, 906 F.3d at 1311 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The movant bears the initial burden of demonstrating that there is no genuine dispute as to any material fact, and the movant must identify the portions of the record which support this proposition. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Moreover, the movant may carry this burden "by demonstrating that the nonmoving party has failed to present sufficient evidence to support an essential element of the case." *Id.* The burden then shifts to the non-moving party to establish, "by going beyond the pleadings, that a genuine issue of material fact exists." *Id.* at 1311–12.

A genuine dispute of material fact exists when the plaintiff produces evidence that would allow a reasonable factfinder to return a verdict in his favor such that summary judgment is not warranted. *See Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam). "The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) (per curiam) (citation omitted). However, disputes involving material facts are relevant, and materiality is determined by the substantive law applicable to the case. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

"In practice, 'cross motions for summary judgment may be probative of the nonexistence of a factual dispute. . . .'" *Ga. State Conf. of the NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1345 (11th Cir. 2015) (citation omitted).  But "the mere filing of cross motions for summary judgment d[oes] not warrant the entry of summary judgment." *Id*. (citation omitted).

## DISCUSSION

The Plaintiffs bring two claims under the Fair Housing Act: intentional discrimination and failure to accommodate.  The City raises several arguments in its summary judgment motion on both claims, ranging from challenges based on standing to evidentiary ones focused on the Plaintiffs' inability to meet their prima facie case.  On these same key facts, the Plaintiffs seek summary judgment on the failure to accommodate claim.  The Court will address these in turn.

### A.        Standing

The City argues the Plaintiffs lack Article III standing because they have failed to establish a direct injury or injury to the individual residents of the Oxford Houses.  The Plaintiffs respond that they have standing because OHI has suffered direct injuries and has associational standing due to the injuries suffered by the residents of each Oxford House.

Article III of the Constitution limits the authority of federal courts, as courts can only decide "cases" and "controversies." *Lujan v. Defs. of Wildlife*, 504 U.S.

7

555, 559 (1992).  For a dispute to be within the power (the subject-matter jurisdiction) of a federal court, the plaintiff must have standing—that is, the plaintiff must have alleged a sufficient interest in the dispute.  This "irreducible constitutional minimum" of standing has three elements: (1) the plaintiff has suffered a concrete injury; (2) that injury is fairly traceable to actions of the defendant; and (3) it must be likely—not merely speculative—that the injury will be redressed by a favorable decision.  *Id.* at 560–61; *Jackson v. Okaloosa Cnty.*, 21 F.3d 1531, 1537 (11th Cir. 1994).

Standing under the Fair Housing Act extends to the full limits of Article III. *See Havens Realty Corp. v. Coleman,* 455 U.S. 363, 372 (1982).  Plaintiffs must show facts supporting standing.  *See City of Mia. Gardens v. Wells Fargo & Co.*, 931 F.3d 1274, 1288 (11th Cir. 2020) (per curiam) (finding that plaintiff failed to satisfy its burden of establishing standing and therefore vacating grant of summary judgment in favor of defendant and remanding with instructions to dismiss for lack of subject-matter jurisdiction), *reh'g en banc denied*, 956 F.3d 1319 (11th Cir. 2020); *Bischoff v. Osceola Cnty.*, 222 F.3d 874, 881 (11th Cir. 2000) ("[E]ach element of standing 'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation.'" (citation omitted)).

An organization that alleges violations of the Fair Housing Act can establish standing under "both a diversion-of-resources theory and an associational standing theory." *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014). OHI asserts it has standing under both theories based on its direct injuries and derivatively through the injuries suffered by Oxford House residents. Because the Court concludes that OHI has standing under a diversion-of-resources theory, the Court will pretermit discussion of associational standing. "Under the diversion-of-resources theory, an organization has standing to sue when a defendant's illegal acts impair the organization's ability to engage in its own projects by forcing the organization to divert resources in response." *Id.* (citing *Coleman*, 455 U.S. at 379); *see also Cent. Ala. Fair Hous. Ctr., Inc. v. Lowder Realty Co.*, 236 F.3d 629, 640 (11th Cir. 2020) ("[T]he only injury which must be shown to confer standing on a fair housing agency is deflection of the agency's time and money from counseling to legal efforts directed against discrimination. These are opportunity costs of discrimination since although the counseling is not impaired directly there would be more of it were it not for the defendant's discrimination.") (citation omitted)). Under the diversion-of-resources theory, an organization must explain what activities it "would divert resources away *from* in order to spend additional resources on combatting the primacy effect" of the defendant's actions. *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1250 (11th Cir. 2020).

To establish resource diversion, OHI cites the Declaration of J. Paul Molloy, Chief Executive Officer of OHI.  (Doc. 65 at 9 (citing Doc. 2).)  In his declaration, Molloy states that the City's refusal to grant the Plaintiffs an accommodation has specifically caused OHI to redirect time and money from "performing and working on contracts and the mission of opening Oxford Houses" to investigating the City's actions and the law, attempting to negotiate a resolution, mitigating the effects of houses not having or losing utility service, and conferring with legal counsel on how to proceed.  (Doc. 2 at 6.)  Based on Molloy's declaration, OHI has sufficiently established standing through its own injury-in-fact based on its diversion of resources from serving existing Oxford Houses and opening new houses pursuant to its contract with the State of Alabama to combat the City's actions, i.e., the City's refusal to exempt the Oxford Houses from the City's business license requirement. *Cf. Jacobson*, 974 F.3d at 1250 (holding plaintiff organization did not establish standing under a diversion-of-resources theory where it did not explain what activities it would divert resources from to address the defendant's actions). Since the Court has determined that OHI has standing, it will not inquire into whether each of the three Oxford Houses also has standing.  *See Rumsfeld v. Forum for Acad. Institutional Rts., Inc*., 547 U.S. 47, 52 n.2 (2006) ("[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.");

*A.C.L.U. of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1195 (11th Cir. 2009).

### B.        Fair Housing Act Prima Facie Cases

The Fair Housing Act of 1968, as amended by the Fair Housing Amendment Act of 1988, 42 U.S.C. § 3061 *et seq*. (FHA), prohibits discrimination in the sale, rental, and financing of dwellings and other housing-related transactions based on disability.  An FHA violation can be established by three methods: (1) intentional discrimination, (2) discriminatory impact, or (3) a failure to make a reasonable accommodation.  *See Bonasera v. City of Norcross*, 342 F. App'x 581, 583 (11th Cir. 2009) (per curiam) (citing *Schwarz v. City of Treasure Island*, 544 F.3d 1201 (11th Cir. 2008)).  The Plaintiffs bring claims under the first and third methods— intentional discrimination and the failure to make a reasonable accommodation.

The City argues that summary judgment is due to be granted because the Plaintiffs cannot meet the prima facie elements of their claim in Count I, which is premised upon intentional discrimination, and Count II, which is premised upon the failure to accommodate.  In a summary judgment motion of their own, the Plaintiffs argue they are entitled to summary judgment in their favor on the failure-to-accommodate claim.

11

### 1.    Count I — Intentional Discrimination

Count I asserts intentional discrimination through a disparate treatment claim.[3]  "To prove intentional discrimination, 'a plaintiff has the burden of showing that the defendants actually intended or were improperly motivated in their decision to discriminate against persons protected by the FHA.'"  *Bonasera*, 342 F. App'x at 584 (quoting *Reese v. Miami-Dade Cnty.*, 242 F. Supp. 2d 1292, 1301 (S.D. Fla. 2002)); *Belcher v. Grand Reserve MGM, LLC*, 269 F. Supp. 3d 1219, 1229 (M.D. Ala. 2017).  "The ultimate question in cases like this one—whether a plaintiff has been unlawfully discriminated against—can be resolved only in the light of the specific facts of each case."  *Woodward v. Fanboy*, 298 F.3d 1261, 1267 (11th Cir. 2002).

Discriminatory intent may be established by direct or circumstantial evidence. *Sailboat Bend Sober Living, LLC v. City of Fort Lauderdale*, 46 F.4th 1268, 1281 (11th Cir. 2022) (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977)).  The Plaintiffs do not argue that there is direct evidence of intentional discrimination; instead, they rely on circumstantial evidence.

---

[3] The Plaintiffs do not raise a claim of facial discrimination as it concerns the utilities account business license policy or with the City's interpretation of the business license regulation.  As such, many of the cases cited by the Plaintiffs concerning the Oxford House concept have little, if any, applicability.

To assess an intentional discrimination claim with circumstantial evidence of discriminatory intent, the *McDonnell Douglas* burden-shifting framework applies. *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).  Under this framework, a plaintiff must first establish a prima facie case of discrimination. *Id.*; *Jackson v. City of Auburn*, 41 F. Supp. 2d 1300, 1314 (M.D. Ala. 1999).  In assessing whether a plaintiff has established a prima facie case of discrimination, the Eleventh Circuit has applied the factors set out in *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252 (1977).  *See Sailboat Bend*, 46 F.4th at 1281–82.  Among these factors are: (1) the discriminatory or segregative effect of the decision; (2) the historical background of the decision; (3) the sequence of events leading up to the challenged decision; and (4) whether there were any departures from normal or substantive criteria.  *Id.* at 1282 (citing *Hallmark Devs., Inc. v. Fulton Cnty.*, 466 F.3d 1276, 1283 (11th Cir. 2006)).

The Court begins with the observation that neither party clearly defines the City's decision at issue here.  Is it the City's decision to deny the Plaintiffs' utilities account applications?  Or is it the City's decision to construe the business license regulation in a way that improperly captures groups of unrelated individuals who wish to reside together?  The parties appear to interchangeably mix the two, although the Plaintiffs make no real effort to complain about the City's interpretation of the business license regulation other than to state that the Oxford Houses "barely

qualify" under its broad definition.  At oral argument, when questioned on their interpretation of the business license regulation, the Plaintiffs acknowledged that it was sufficiently broad in scope to capture the Oxford Houses.   This acknowledgement therefore leaves the primary discussion focused on the City's requirement that the Oxford Houses obtain business licenses in order to open utilities accounts in their associational names, which the Plaintiffs claim is violative of the FHA.

The first *Arlington Heights* factor focuses on the effect of the City's decision to require the Oxford Houses to obtain business licenses as a condition of opening utilities accounts.  In assessing this factor, the Eleventh Circuit has looked to "whether the city's decision, though neutral on its face and as applied, has a 'disparate impact' on individuals with disabilities." *Sailboat Bend*, 46 F.4th at 1282 (citing *Hallmark*, 466 F.3d at 1285–87).  As an initial matter, the Plaintiffs have proffered no statistical evidence *of any kind* to support any view that the City's actions disproportionately impacted individuals with disabilities.  *Cf. Hallmark*, 466 F.3d at 1286 (explaining disparate impact is typically demonstrated by statistics).

The Plaintiffs do appear to argue that there is evidence of selective or uneven enforcement of the business license policy, as they state the City does not require unrelated, non-disabled persons living together as a family unit to obtain a business license while it requires groups of unrelated, disabled persons to obtain a business

14

license.  *See Sailboat Bend*, 46 F.4th at 1282 (suggesting that evidence that a municipality applied a fire code to the plaintiffs' home but failed to apply the same code "to some other category of similarly situated homes" is relevant to the assessment of the first *Arlington Heights* factor).  But the Plaintiffs misstate the inquiry.  The relevant inquiry is whether the City excuses other unrelated, non-disabled persons who apply for utilities accounts *in an associational name* and with EINs from obtaining a business license.  *See Schwarz*, 544 F.3d at 1216 (requiring the plaintiff to show that "he has actually been treated differently than *similarly situated* non-handicapped people" (emphasis added)).  When confined to the proper inquiry, the Plaintiffs present no evidence that other similar groups within the municipality—whether they are veterans homes, group homes, or fraternity houses—have been allowed to open a utilities account in their associational name with an EIN without a business license.  And on this point, the City has provided evidence showing that twelve other group homes in the municipality have opened utilities accounts in their associational names while also procuring business licenses.

In their brief, the Plaintiffs vaguely reference a landlord as an entity that is treated differently.  But the Plaintiffs fail to show how this evidences discriminatory treatment when compared to a similar group of unrelated, non-disabled individuals. While the Plaintiffs find fault with the scope and fairness of the business license regulation and why the regulation creates an exception for certain classes of

businesses (landlords with three or fewer houses, for example), the Plaintiffs do not show how a landlord is a similarly situated group of unrelated, non-disabled persons living together who is treated differently for utilities account or business license purposes.

As such, the absence of any showing of selective enforcement or application weighs against the Plaintiffs' intentional discrimination claim. *See Sailboat Bend*, 46 F.4th at 1282 (plaintiffs provided no evidence that the city selectively enforced the Code against them but "failed to apply the same Code to some other category of similarly situated homes"); *Schwarz*, 544 F.3d at 1217 ("With selective-enforcement claims . . . , evenhanded application of the law is the end of the matter."); *His House Recovery Residence, Inc. v. Cobb Cnty.*, 806 F. App'x 780, 785 (11th Cir. 2020) (per curiam) (rejecting a sober home's intentional discrimination claim because the home "fail[ed] to provide sufficient evidence that the County treated them differently from similarly situated non-disabled citizens"); *see also Bonasera*, 342 F. App'x at 586 (rejecting claim premised on race-based selective enforcement because there was "no evidence that the City was aware of any violations of the single-family zoning ordinance by white homeowners and chose to ignore them"). And as has been said, there must be evidence that "the recoverers were treated differently than non-recoverers." *Schwarz*, 544 F.3d at 1216–17. Here, there is none. Instead, the undisputed facts show that the City requires business licenses as a condition of

opening an account for any unrelated group of individuals, disabled or not, who want to open an account using an associational name and EIN.  This evidence does not permit an inference of unlawful discrimination based on disability.

In an apparent effort to show discrimination through the sequence of events, which is the third *Arlington Heights* factor, the Plaintiffs present declarations from several residents of one of the Oxford Houses that detail their observations and interactions with law enforcement.   Specifically, the Plaintiffs claim that "circumstantial evidence of discriminatory intent continued to accumulate following the City's denial of the requested accommodation in the form of multiple incidents of harassment and intimidation by local law enforcement." (Doc. 61 at 28.)  As the City notes, the Plaintiffs first raised this evidence well after the utilities account applications had been denied, after the filing of this lawsuit, and after the close of discovery, thereby depriving the City of an opportunity to delve further into these accusations.

In any event, the Plaintiffs' previously undisclosed statements about law enforcement conduct are insufficient to demonstrate disparate treatment.  As a threshold matter, the "sequence of events" with which *Arlington Heights* is concerned is the sequence of events "*leading up to* the challenged decision."  429 U.S. at 267 (emphasis added); *see also Sailboat Bend*, 46 F.4th at 1282.  But the Plaintiffs' statements pertain to events *following* the City's refusal to exempt them

from the business license requirement.  To the extent that the sequence of events following the challenged decision is relevant, the Plaintiffs nonetheless fail to make a sufficient connection between these incidences involving unidentified law enforcement officers[4] with OHI's earlier efforts to open utilities accounts at a different municipal office.  Put differently, the Plaintiffs fail to explain how alleged conduct by non-decisionmakers demonstrates intentional discrimination by the decisionmakers.  *Cf. Mitchell v. USBI Co.*, 186 F.3d 1352, 1355 (11th Cir. 1999) (per curiam) (analyzing age discrimination claim and explaining that "comments by non-decisionmakers do not raise an inference of discrimination, especially if those comments are ambiguous").  And even if the referenced law enforcement actions were construed as evidence of hostility against sober living homes such as an Oxford House, they do not constitute sufficient evidence of disparate treatment *with respect to the City's business license requirement* that warrants denial of summary judgment in the absence of evidence that "recoverers were treated differently than non-recoverers."  *See Schwarz*, 544 F.3d at 1216 ("[E]vidence that neighbors and city officials are biased against recovering substance abusers is irrelevant absent some indication that the recoverers were treated differently than non-recoverers." (citing

---

[4] In one declaration, the declarant stated that two Dothan police cars parked on the street curb in front of an Oxford House with their lights on, and that officers then walked up and down the street. Even though there was no engagement or communication and no evidence that the officers' actions were directed at the Oxford House residents, the Plaintiffs claim this was harassing and intimidating conduct and thereby evidence of a hostility toward them.

*Oxford House-C v. City of St. Louis*, 77 F.3d 249, 252 (8th Cir. 1996)); *His House*, 806 F. App'x at 785 ("While the record is clear that some neighbors were opposed to His House's presence on Miller Drive, 'evidence that neighbors and city officials are biased against recovering substance abusers is irrelevant absent some indication that the recoverers were treated differently than non-recoverers.'" (citation omitted)).

The Plaintiffs also argue that because the City denied their accommodation request "without any regard for its necessity to Oxford House residents," such denial constitutes circumstantial proof of intentional discrimination. (Doc. 61 at 28.) But the Plaintiffs cite no authority for this proposition, nor does the Court see how this constitutes evidence of discriminatory intent, especially since no evidence has been presented showing that the City treats the Oxford Houses differently from any other groups of unrelated, non-disabled individuals who apply for utilities accounts in their associational names. To the extent this assertion has any relevance, it is a more appropriate consideration in the context of the Plaintiffs' failure-to-accommodate claim, which is discussed below.

As for the other *Arlington Heights* considerations—historical context of the challenged actions and deviations from ordinary practice and procedure—the Plaintiffs make no effort to argue, and the Court finds insufficient evidence to conclude, that any of these factors weigh in the Plaintiffs' favor.

In short, the Plaintiffs fail to provide sufficient evidence to establish a prima facie case of intentional discrimination, that is, to meet their initial "burden of showing that the defendants actually intended or were improperly motivated in their decision to discriminate against persons protected by the FHA." *See Bonasera*, 342 F. App'x at 584. Summary judgment is therefore due to be granted in favor of the City and against the Plaintiffs on Count I.

### 2. Count II — Failure to Accommodate

Count II asserts a failure-to-accommodate claim under the FHA. The Plaintiffs claim the City has discriminated against them by failing to accommodate their requests to waive the business license requirement. Both sides move for summary judgment on this claim.

To prove an FHA failure-to-accommodate claim, a plaintiff must show that "(1) he is disabled within the meaning of the FHA, (2) he requested a reasonable accommodation, (3) the requested accommodation was necessary to afford him an opportunity to use and enjoy his dwelling, and (4) the defendants refused to make the accommodation." *Bhogaita v. Altamonte Heights Condo. Ass'n, Inc.*, 765 F.3d 1277, 1285 (11th Cir. 2014) (citing *Schwarz*, 544 F.3d at 1218–19). Of these, the parties' primary focus is the second and third elements—whether the requested accommodation was *reasonable* and *necessary*.

To be sure, the FHA does not require that all accommodation requests be

20

granted.  *See id.* at 1285–86; *see also Loren v. Sasser*, 309 F.3d 1296, 1302 (11th Cir. 2002) (per curiam) (noting that whether the law requires an accommodation is "highly fact-specific, requiring case-by-case determination" (quoting *Groner v. Golden Gate Gardens Apartments*, 250 F.3d 1039, 1044 (6th Cir. 2001))).  But it does require "*reasonable* accommodations in rules, policies, practices, or services, when such accommodations may be *necessary* to afford such person equal opportunity to use and enjoy a dwelling."  42 U.S.C. § 3604(f)(3)(B) (emphases added).  This is so because the FHA seeks to provide a disabled person an equal opportunity to enjoy a dwelling that would otherwise—*due to his disability*—elude him. *Schaw v. Habitat for Humanity of Citrus Cnty., Inc.*, 938 F.3d 1259, 1273 (11th Cir. 2019).  If the accommodation provides "no direct amelioration of a disability's effect," the accommodation is not necessary.  *See Bryant Woods Inn, Inc. v. Howard Cnty.*, 124 F.3d 597, 604 (4th Cir. 1997) (commenting that "if the proposed accommodation provides no direct amelioration of a disability's effect, it cannot be said to be 'necessary'").  This breaks down into two inquiries: (1) whether the plaintiff can show that the accommodation "actually alleviates the effects of the plaintiff's disability"; and (2) whether the accommodation "addresses the needs created by the plaintiff's disability."  *Sailboat Bend*, 46 F.4th at 1280 (citing *Schwarz*, 544 F.3d at 1226).

The Plaintiffs claim the accommodation is necessary because of therapeutic

and financial reasons.  The therapeutic need, as couched by the Plaintiffs, is that "[r]ecovery under the Oxford House model promotes accountability and truth," a business license incorrectly classifies the residents as a business, and "having the residents certify or register themselves as a business when they are not a business is dishonest and detrimental to their recovery and the model."  (Doc. 29 at 8.)  The Plaintiffs further contend that the alternative to obtaining a business license— making the landlord responsible for the utilities—is unacceptable because making the landlord responsible "has negative therapeutical impacts by insulating the residents from direct liability to the government actor, and deflects it to the property owner." (Doc. 61 at 23.)  As for the financial need, the Plaintiffs claim there will be an increase in insurance premiums for the landlords that will be passed onto the residents through increased rental rates.

The City argues that there is no evidence showing that applying for a utilities account in the name of an Oxford House, or in doing so without a business license, is necessary for the residents' addiction recovery; no evidence showing how applying for business license would be dishonest and therefore contrary to the tenet of truth and accountability; and no evidence showing that there is a financial need to waive the license requirement.

As a preliminary matter, what is clear is that the Plaintiffs do not argue that their residents' addictions (or recovery) prevent them from living as a group in the

neighborhoods in which the Oxford Houses are located.  Nor do they argue that their residents' addictions prohibit the Plaintiffs from completing the utilities account applications or from signing up for and obtaining a business license.  Indeed, the Plaintiffs present no evidence or argument that their residents' disabilities directly prevent the Plaintiffs from opening utilities accounts, either individually or in their associational names, or from obtaining business licenses in order to open those accounts.  They admit they can easily do that.  Instead, the Plaintiffs' claimed need arises from alleged therapeutic needs and financial burdens resulting from obtaining the business license, which the City disputes as factually and causally disconnected and strained.  The Court agrees with the City.

First, the Plaintiffs' assertion of a therapeutic need is strained and contrary to the evidence.  The Plaintiffs' expert says the therapeutic need comes from the impact of having the residents dishonestly state on an application that they are a "business" when they are not a business but instead a quasi-family unit.  But the evidence presented shows that it is employees of OHI—Phelps and Ford—not the residents of the Oxford Houses who complete the utilities account applications and who are serving as the points of contact with the City concerning the utilities accounts.  Thus, the evidence presented does not show that the *residents* would have to make dishonest statements.  To the extent the Plaintiffs argue that the mere presence in the business license of dishonest statements about the residents would have a negative

therapeutic impact, even if the statements were made by others, the Plaintiffs cite no evidence that the residents have or would have knowledge of the business licenses or their contents, i.e., the allegedly dishonest designation of the Oxford Houses as a business.  As such, the Plaintiffs have failed to demonstrate that their requested accommodation—an exemption from the business license requirement—is *necessary* under the FHA because they have not shown that the accommodation "addresses the [therapeutic] need[] created by [their] disability." *See Sailboat Bend*, 46 F.4th at 1280 (citation omitted).

The Plaintiffs' direct liability argument is also unavailing.  As explained above, the Plaintiffs argue that the alternative to obtaining a business license—making the landlord responsible for the utilities—is unacceptable because doing so "has negative therapeutical impacts by insulating the residents from direct liability to the government actor, and deflects it to the property owner."[5]  (Doc. 61 at 23.)  But the Plaintiffs cite no record evidence indicating that the landlords would be responsible for the utilities if the Plaintiffs obtained a business license.  Thus, under this theory, complying with the business license requirement does not create a problem and concomitant need for an accommodation because of disability; rather, it is the *alternative* to such compliance that creates the problem.  As such, this argument does not help the Plaintiffs demonstrate that their requested

---

[5] But applying for an account in an associational name also insulates the individual residents from direct liability.

accommodation—an exemption from the business license requirement—is necessary under the FHA. *See Sailboat Bend*, 46 F.4th at 1280.

And even if the Court is wrong on this point, the Plaintiffs argument still fails. Although one of the Plaintiffs' experts testified that having the utilities in the house's name, as opposed to the landlord's name, "really promotes responsibility to the people that live there," (Doc. 58-3 at 104–05), this testimony does not establish that the Plaintiffs' requested accommodation is necessary under the FHA because it does not show that the accommodation "*actually alleviates* the effects of the [Plaintiffs'] disability" or "addresses the *needs* created by the [Plaintiffs'] disability," *see Sailboat Bend*, 46 F.4th at 1280 (emphases added).

The Plaintiffs' claimed financial need also fails. The Plaintiffs argue a waiver of the business license requirement is needed because without it there will be certain financial harms to the residents of an Oxford House. It is true that "an individual's inability to pay *can* render an otherwise-reasonable accommodation *necessary*, so long as 'there is some causal relationship' between the disability and the inability to pay." *Sailboat Bend*, 46 F.4th at 1280 (quoting *Schaw*, 938 F.3d at 1271). But here, the subject of the accommodation request—the business license—comes at no direct cost to the Plaintiffs or their residents; it is free. As such, the claimed financial burden associated with acquiring a business license is premised upon indirect or downstream costs.

The Court will assume without deciding that indirect or downstream costs could rise to the level of financial necessity required under Eleventh Circuit precedent.  To that end, the Plaintiffs claim that a business designation will increase insurance premiums for their landlords, who in turn will pass the costs down to the Oxford Houses through increased rent.  The Plaintiffs suggest they are unable to pay these increased costs because "many residents have low earning power."  (Doc. 58 at 27.)  This argument is tenuous at best.  First, the evidence that the Plaintiffs provide in the form of a commercial insurance quote is not founded on relevant comparative facts to support the Plaintiffs' assertion.  The Plaintiffs currently have a homeowners insurance policy with $300,000 liability limits for a single-family residence, and they provide a quote for a commercial insurance policy with a different insurance carrier with $2 million liability limits for a "group home."  This quote plainly does not provide an apples-to-apples comparison with the Plaintiffs' current homeowners insurance policy.  That the Plaintiffs have provided a quote for a commercial insurance policy with higher liability limits for a "group home" from a different insurance carrier evidences virtually nothing when the Plaintiffs currently have a homeowners insurance policy with lower liability limits for a single family residence.  In other words, even if a financial connection could be made, the appropriate comparison would be to solicit a quote from the same insurance carrier that carries the current single family home risk with the same insurance policy limits

26

but with the sole new element being the fact that the renter has been required to procure a business license.  The Plaintiffs have not attempted to make that comparison.  And when asked during oral argument why they did not, they responded that the landlord did not want to contact his insurance carrier with this kind of quote request.  In any event, the Plaintiffs' evidence is insufficient to demonstrate that their requested accommodation is necessary, either for the Plaintiffs to prevail on their own motion for summary judgment or for the Plaintiffs to survive the City's motion for summary judgment.

The Plaintiffs' argument also fails because it assumes, without evidentiary support, that the landlords will pass on any increased insurance costs to the Oxford Houses and that the residences could not pay or afford it.  Such speculation is insufficient either to allow the Plaintiffs to prevail on their own motion for summary judgment or to allow the Plaintiffs to survive the City's motion for summary judgment.  In sum, the Plaintiffs have failed to demonstrate that there is a financial need to exempt them from the business license requirement.

Because the Court concludes that the requested accommodation—waiver of the business license requirement—is not necessary,[6] the FHA failure-to-accommodate claim fails, and summary judgment is due to be granted in favor of

---

[6] And because the Court concludes that the requested accommodation is not necessary, the Court pretermits discussion of whether the accommodation is reasonable.

the City and against the Plaintiffs as to Count II.

## CONCLUSION

Based on the preceding, it is **ORDERED** as follows:

(1) Defendant's Motion for Summary Judgment (Doc. 54) is GRANTED;

(2) Plaintiffs' Motion for Partial Summary Judgment (Doc. 57) is DENIED;

(3) Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction (Doc. 4) is DENIED as moot;

(4) Plaintiffs' Second Motion for Preliminary Injunction (Doc. 31) is DENIED as moot;

(5) The parties shall bear their own costs.

(6) A separate Final Judgment will issue.

**DONE**, on this the 6th day of December, 2022.


                    /s/ R. Austin Huffaker, Jr.
                    R. AUSTIN HUFFAKER, JR.
                    UNITED STATES DISTRICT JUDGE